UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

DAVID STADLER,

                Petitioner,                       Case Number: 06-14286
                                                Honorable David M. Lawson

v.

CINDI S. CURTIN,

                Respondent.

_____/

## OPINION AND ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS

Michigan prisoner David Stadler has filed a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254 challenging his conviction for first-degree criminal sexual conduct and his prison sentence of twenty-five to forty years. The petition, filed by counsel, states ten claims. Stadler says he was deprived of due process of law as a result of the delay in bringing the charge, the denial of certain pretrial discovery motions, the destruction of exculpatory evidence, an improper pretrial photographic show-up, an improper jury instruction, the prosecutor's failure to produce witnesses, and the prosecutor's misconduct; he was denied effective assistance of competent counsel because his trial lawyer did not pursue an alibi defense and did not let him testify, and the trial court did not allow the petitioner to discharge the lawyer immediately before trial; and his sentence is improper because it is excessive under the Eighth Amendment and based on judge-found facts that were not determined by a jury in violation of the Sixth Amendment. The respondent filed an answer to the petition asserting that an adequate and independent state procedural ruling bars review of some of the claims by this Court, and the state courts' disposition of the rest of them did not result in an objectively unreasonable application of clearly established Supreme Court law. The Court finds that

three of the petitioner's claims are barred by the doctrine of procedural default, and the balance do not warrant habeas relief on the merits. Therefore, the Court will deny the petition.

I.

The victim of the sexual assault, identified here as N.C., says that the petitioner raped her at her home on June 14, 1997. N.C. reported the incident to police the next day, but then she refused to cooperate in the prosecution until she was contacted three years later by a detective who was reviewing old open files. She apparently agreed to testify, and a charge was filed against the petitioner in the spring of 2001. The petitioner was brought to trial eventually on November 8, 2002 after several pretrial motions were litigated.

 N.C. testified at a preliminary examination and at trial that she first came into contact with the petitioner when he called her home, allegedly dialing a wrong number. N.C. nonetheless continued the conversation, and they talked on the phone six to eight times again. N.C. met the petitioner in person thereafter and saw him twice prior to the incident. They first met at a bar, where the N.C. had gone with friends and clients (N.C. said she was a nail technician) named Tracy and Kelly and Brian Bankey. The meeting was not pre-arranged; instead, N.C. said that the petitioner just showed up at the bar that night and approached her, even though she had not told him what she looked like. According to N.C., the petitioner walked over to her and asked her "if I was "N[] and I said yeah. And he said I'm Dave." Trial Tr. vol. III at 56. She said they talked for about ten minutes. She did not introduce the petitioner to her friends. N.C. said she did not go out with these friends on a regular basis and could not remember their full names.

N.C. testified that the next time she saw the petitioner was when she was outside her home playing with her four-year-old son. She said that the petitioner walked up to her and told her he was

-2-

visiting a friend, who lived across the street.  N.C. said she then told her son to go inside, and she and the petitioner talked for about ten to twenty minutes.  N.C. testified that she had not told the petitioner where she lived.

The rape occurred two to three weeks after the initial phone call.  Although N.C. described some of the details of the interaction leading up to the assault inconsistently at the preliminary examination and at trial, she said that on June 14, 1997, the petitioner came to N.C.'s house near 10:00 p.m.; they planned to go out that evening.  The two were on the couch either before or after N.C. was getting ready in the bathroom.  At some point, the petitioner tried to kiss N.C., and she told him no.  Then the petitioner made his advance, either as they were sitting on the couch or as he was standing in the door of the bathroom while N.C. was in the midst of getting ready for the evening.  N.C.'s two versions of the events converged when she described the rape itself.  She testified that the petitioner pushed her onto the couch and, in a struggle that ensued, ripped her sweatshirt.  N.C. claims that the defendant proceeded to take her pants and underwear off, ignoring her pleas to stop.  In the process, she ended up with a black eye and a bite mark on her right breast.  She said that the petitioner then forced his penis into her vagina.  N.C. testified that once the petitioner ejaculated, she immediately ran into the bathroom and cleaned herself.   She said that when she came out of the bathroom, the petitioner was still sitting on her couch and, when asked to leave, inquired whether they were still going to a movie.  She said no, and the petitioner left.  As the petitioner was leaving, he said, "[G]ood luck with Matt."  Trial Tr. vol. III at 90.  N.C. testified that she told the petitioner that she had just split up with her son's father, but she did not recall ever mentioning that his name was Matt.

After the petitioner left, N.C. said that she took a shower and douched three or four times, cleaned off the couch with Lysol, locked all the doors, and, after taking three sleeping pills, went to sleep. She said that she did not call the police or her neighbors because she was embarrassed over what had happened, and that she let the petitioner into her house.

The next evening, N.C. saw her friend Jean and told her what had happened. At Jean's urging, the two went to the Sterling Heights, Michigan police station together that night. N.C. talked to two or three police officers and filled out a statement, but did not tell the police everything because she did not want to pursue prosecution. The police investigator took photographs of her black eye and the bite mark on her breast. She explained that she did not lie to the police, but she did not tell them all of the details of the assault. She claims that she told the police the first and last name of her assailant, a point that was hotly contested at trial and contradicted by testimony from police witnesses, who said N.C. only revealed a first name.

According to N.C., a police officer contacted her shortly afterward, and she told him that she had been raped. She acknowledged that she made several appointments to view a photo lineup but never kept those appointments. She said she just wanted to forget the incident and move on with her life. She said that she also wrote a letter to Matt (the father of her son) telling him what had happened but never told anyone else other than Matt and Jean.

According to testimony from a pretrial hearing challenging the photographic show-up, this case came to the attention of Sterling Heights police detective Thomas McMullen, who was investigating other cases involving the petitioner and reports of stalking and random phone calls to women. McMullen said he called N.C. and asked her if she would now be interested in going forward with a prosecution. She agreed. On March 9, 2001, McMullen went to N.C.'s apartment

-4-

along with a female detective and showed N.C. a pre-arranged photo array.  He said that N.C. identified the petitioner, whose photograph was number five in the array, within "three seconds or less."  Evid. Hr'g Tr., Oct. 18, 2002, at 13.  A formal prosecution followed.

The petitioner filed several pretrial motions in the state trial court.  In October 2001, the petitioner moved for discovery of the names of the people at the bar the night N.C. said she first met the petitioner.  He also said he wished to take a polygraph test to exonerate himself, although he changed his mind about that later and ultimately expressed satisfaction with the discovery information provided.  In August 2002, the petitioner filed motions to dismiss for failure of the prosecution to provide discovery, for assistance in locating witnesses, and to dismiss for pretrial delay.  The court denied the motions to dismiss.  As for the delay in bringing the charges, the court found that the cause was attributed solely to N.C.'s reluctance to pursue prosecution, and the state played no role and did not delay to obtain a tactical advantage.  In September 2002, the petitioner moved the trial court to exclude similar act evidence, and the motion was granted.  In October 2002, the trial court held a hearing on the petitioner's motion challenging the pretrial identification and found that the procedure used by Detective McMullen was not unduly suggestive.

In the meantime, the State offered several plea agreements to the petitioner, including an agreement to dismiss the original charge if the petitioner would plead guilty to (1) fourth-degree criminal sexual conduct, a two-year misdemeanor; or (2) third-degree criminal sexual conduct, capped at Macomb County jail time; or (3) assault with intent to do great bodily harm.  On May 3, 2002, the petitioner pleaded no contest to the offense of assault with intent to do great bodily harm. However, at his sentence hearing on June 11, 2002, the petitioner moved to withdraw his plea, and

-5-

on June 25, 2002 the trial court granted his request.  At that time, the petitioner had retained new counsel.

Trial began on October 30, 2002.  During her testimony, N.C. acknowledged that she had destroyed potential evidence when she cleaned herself and her couch following the rape, she disposed of the clothes she wore that evening because she did not want to be reminded of the incident, she refused to go to a hospital for an examination after she first reported the incident to the police the following evening, and she delayed the case herself when she initially refused to prosecute.  On November 8, 2002, the jury convicted the petitioner of the original charge of first-degree criminal sexual conduct.

After sentencing, the petitioner filed a direct appeal.  He filed a motion in the state court of appeals to remand the case for a hearing on the issue of trial counsel's ineffectiveness.  The appellate court granted that motion, and thereafter the trial court conducted an evidentiary hearing at which the petitioner, his mother, sister, trial counsel and Detective McMullen all testified.  The trial court filed a written opinion denying the petitioner's post-trial motion on February 27, 2004.

On November 18, 2004, the Michigan Court of Appeals issued an unpublished *per curiam* opinion affirming the petitioner's conviction and sentence.  *People v. Stadler*, No. 245895, 2004 WL 2624741 (Mich. Ct. App. Nov. 18, 2004).  The court found that three of the petitioner's claims – the alleged destruction of exculpatory evidence by the victim, prosecutorial misconduct, and the trial court's refusal to allow the petitioner to discharge his attorney before trial – were not raised properly in the lower court and it reviewed those claims for plain error.  The petitioner then filed an application for leave to appeal in the Michigan Supreme Court, which was denied on September 28, 2005.  *People v. Stadler*, 474 Mich. 868, 703 N.W.2d 815 (2005).

The petitioner filed the pending petition for a writ of habeas corpus on September 28, 2006, presenting the same claims as presented to both state appellate courts:

I.     Excessive delay in charging the petitioner deprived him of due process of law;

II.    Denial of the petitioner's discovery motions resulted in the denial of due process of law;

III.   The complainant's deliberate destruction of exculpatory evidence and the police's failure to take steps to preserve that evidence resulted in the denial of the petitioner's due process rights;

IV.    The sentencing judge's failure to suppress identification resulted in the denial of the petitioner's rights to a fair trial;

V.     The petitioner was denied a fair trial and his due process rights were violated through an incorrect jury instruction regarding the failure of the prosecution to produce requested witnesses and regarding the fact that the jury saw all the evidence that the prosecutor had regarding guilt or innocence of the petitioner;

VI.    The prosecutor prejudiced the petitioner when he called the complaining witness a "victim" before the jury and when he made other improper arguments;

VII.   The petitioner was prejudiced by ineffective assistance of counsel;

VIII.  The petitioner was deprived of his constitutional rights when the trial court refused to allow him to discharge his retained counsel;

IX.    The petitioner's higher-than-the-Guidelines-range sentence was excessive and improper; and

X.     The petitioner's sentence was unconstitutional in that the judge rather than the jury found facts that raised the petitioners sentence above the Sentencing Guidelines.

Pet. at 2-14.  The respondent filed an answer in due course raising a procedural defense and addressing the merits.

-7-

II.

The provisions of the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), Pub. L. No. 104-132, 110 Stat. 1214 (Apr. 24, 1996), which govern this case, "circumscribe[d]" the standard of review federal courts must apply when considering applications for a writ of habeas corpus raising constitutional claims, including claims of ineffective assistance of counsel. *See Wiggins v. Smith*, 539 U.S. 510, 520 (2003).

As amended, 28 U.S.C. § 2254(d) permits a federal court to issue the great writ only if the state court decision on a federal issue "was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court," or it amounted to "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d)(1)&(2); *Franklin v. Francis*, 144 F.3d 429, 433 (6th Cir. 1998). Mere error by the state court will not justify issuance of the writ; rather, the state court's application of federal law "must have been objectively unreasonable." *Wiggins*, 539 U.S. at 520-21 (quoting *Williams v. Taylor*, 529 U.S. 362, 409 (2000) ( internal quotes omitted)). Additionally, this Court must presume the correctness of state court factual determinations. 28 U.S.C. § 2254(e)(1) ("In a proceeding instituted by an application for a writ of habeas corpus by a person in custody pursuant to the judgment of a State court, a determination of a factual issue made by a State court shall be presumed to be correct."); *see also West v. Seabold*, 73 F.3d 81, 84 (6th Cir. 1996) (stating that "[t]he court gives complete deference to state court findings of historical fact unless they are clearly erroneous").

The Supreme Court has explained the proper application of the "contrary to" clause as follows:

-8-

> A state-court decision will certainly be contrary to [the Supreme Court's] clearly established precedent if the state court applies a rule that contradicts the governing law set forth in our cases. . . .
>
> A state-court decision will also be contrary to this Court's clearly established precedent if the state court confronts a set of facts that are materially indistinguishable from a decision of this Court and nevertheless arrives at a result different from [the Court's] precedent.

*Williams*, 529 U.S. at 405-06.

The Supreme Court has held that a federal court should analyze a claim for habeas corpus relief under the "unreasonable application" clause of § 2254(d)(1) "when a state-court decision unreasonably applies the law of this Court to the facts of a prisoner's case." *Id.* at 409. The Court defined "unreasonable application" as follows:

> [A] federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was objectively unreasonable. . . .
>
> [A]n *unreasonable* application of federal law is different from an *incorrect* application of federal law. . . . Under § 2254(d)(1)'s "unreasonable application" clause, then, a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable.

*Id.* at 409-11; *see also Knowles v. Mirzayance*, __ U.S. __, __, 129 S. Ct. 1411, 1419 (2009) (noting that the Supreme "Court has held on numerous occasions that it is not "'"an unreasonable application of clearly established Federal law"'" for a state court to decline to apply a specific legal rule that has not been squarely established by this Court") (quoting *Wright v. Van Patten*, 552 U.S. 120, 125-26 (2008) (per curiam)); *Murphy v. Ohio*, 551 F.3d 485, 493-94 (6th Cir. 2009); *Eady v. Morgan*, 515 F.3d 587, 594-95 (6th Cir. 2008); *Davis v. Coyle*, 475 F.3d 761, 766-67 (6th Cir. 2007); *King v.*

*Bobby*, 433 F.3d 483, 489 (6th Cir. 2006); *Rockwell v. Yukins*, 341 F.3d 507, 512 (6th Cir. 2003) (en banc).

A.

In his first claim, the petitioner argues that his due process rights were violated by the prosecutor's delay in bringing charges, since the offense occurred in June 1997 and the petitioner was not charged until March of 2001. The state court denied the petitioner's pretrial motion to dismiss on this ground. The petitioner had argued that he was prejudiced by the delay because his potential alibi defense was weakened, he could not determine the identity of individuals that were present with N.C. at the bar on the night in question, and he could not use a bite mark expert until discovery in the case was completed. In rejecting this claim, the trial court found that the petitioner had failed to establish that the prosecutor intentionally delayed this case to gain a tactical advantage, the delay was caused by N.C.'s refusal to identify and prosecute the petitioner, and the petitioner had failed to establish that he had suffered substantial prejudice as a result of the delay. The Michigan Court of Appeals agreed, stating:

> Here, defendant relied on testimony from the preliminary examination, as well as the victim's 1997 police report, in which the assailant was identified only as "Dave" and reflected the victim's unwillingness to prosecute, as support for his motion to dismiss. In denying defendant's motion, the trial court determined that defendant failed to establish either that he was prejudiced by the delay or that the prosecution obtained an advantage. We agree.
>
> The record discloses that defendant failed to establish that any relevant information beneficial to the defense was lost because of the delay. "Actual prejudice is not established by general allegations or speculative claims of faded memories, missing witness, or other lost evidence." Because we agree with the trial court that there was no evidence to suggest that the delay in filing formal charges was intended to give the prosecution a tactical advantage, the trial court did not abuse its discretion in denying defendant's motion to dismiss.

*Stadler*, No. 245895, 2004 WL 2624741, at *2 (citations omitted).

-10-

The petitioner contends that this ruling misapplies federal law.  However, the Supreme Court has held consistently that "[t]here is no constitutional right to be arrested."  *Hoffa v. United States*, 385 U.S. 293, 310 (1966).  Elaborating on that concept, the *Hoffa* Court explained:

> The police are not required to guess at their peril the precise moment at which they have probable cause to arrest a suspect, risking a violation of the Fourth Amendment if they act too soon, and a violation of the Sixth Amendment if they wait too long.  Law enforcement officers are under no constitutional duty to call a halt to a criminal investigation the moment they have the minimum evidence to establish probable cause, a quantum of evidence which may fall far short of the amount necessary to support a criminal conviction.

*Ibid.*

The Due Process Clause does provide some measure of protection against preindictment delay.  *United States v. Lovasco*, 431 U.S. 783, 789 (1977); *see also United States v. Marion*, 404 U.S. 307, 324 (1971).  But the Court has observed that "no one's interests would be well served by compelling prosecutors to initiate prosecutions as soon as they are legally entitled to do so."  *Lovasco*, 431 U.S. at 792.  Proof of prejudice is a necessary element of a due process claim for preindictment delay.  *Lovasco*, 431 U.S. at 790.  The Sixth Circuit has consistently read *Lovasco* to hold that dismissal for preindictment delay is warranted only when the defendant shows both substantial prejudice to his right to a fair trial and that the delay was intentionally imposed by the government to gain a tactical advantage.  *See United States v. Brown*, 959 F.2d 63, 66 (6th Cir. 1992).  The prosecution of a defendant following an investigative delay does not necessarily deprive him of due process, even if his defense is somewhat prejudiced by the lapse of time.  *Lovasco*, 431 U.S. at 796.

-11-

The petitioner in this case contends that the delay was intentional or used by the prosecution to gain a tactical advantage. The state trial court's contrary conclusion is well supported by the evidence, and therefore this Court is bound to accept it. *See* 28 U.S.C. § 2254(e)(1).

The petitioner also argues that the delay caused him substantial prejudice. Prejudice does not result automatically from long periods of delay alone. *Brown*, 959 F.2d at 67 (citing cases in which pre-indictment delay was thirty-three months, twenty-nine months, and five years). The Supreme Court has held that a criminal defendant's interest in avoiding unreasonable delays is served by statutes of limitation. *Marion*, 404 U.S. at 325-26. Actual prejudice must be shown to establish a deprivation of due process when a prosecution is commenced within the period of limitation. The *Marion* Court explained:

> Appellees rely solely on the real possibility of prejudice inherent in any extended delay: that memories will dim, witnesses become inaccessible, and evidence be lost. In light of the applicable statute of limitations, however, these possibilities are not in themselves enough to demonstrate that appellees cannot receive a fair trial and to therefore justify the dismissal of the indictment.

*Ibid.*

The Court finds that the state court of appeals' determination that the petitioner did not demonstrate sufficient prejudice was reasonable. The petitioner did not suggest to the state court any specific witness or evidence that was denied him as a result of the delay in bringing the charge. For instance, he did not file an affidavit from a bite mark expert to show that such a witness could have helped the defense. The petitioner did not explain which witnesses could support his alibi defense, what their testimony could be, and how the delay interfered with the testimony. The petitioner did file in this Court affidavits of himself, his mother, his sister, and his nephew asserting

-12-

that the petitioner spent the evening in question at a family get-together.  But these witnesses are still available and apparently able to testify; delay has not deprived the petitioner of this evidence.

Of course, as with any witness, memories likely faded over the time between the crime and the arrest, and it always is better to hear from a witness when the events are fresh in the mind.  But no constitutional violation results merely because a witness's rendition of events is less than perfect.  The petitioner here has presented witnesses whose memories were diminished no more than in *Marion*.  Because the petitioner has shown neither prejudice nor unfair advantage to the State, the Court must conclude that no constitutional violation was presented in the first claim.

B.

In his second claim, the petitioner contends that his due process rights were violated because the trial court denied his motion to compel the prosecutor to turn over information about past misconduct, including prior convictions, of the State's non-police witnesses.  In response to the petitioner's motion during trial, the prosecution agreed to provide such materials as to N.C. and her neighbor, but stated that it was not aware of any evidence of prior misconduct by any of its non-police witnesses.  The trial court found that the prosecution's concession was adequate and denied additional relief.  The Michigan Court of Appeals affirmed the ruling of the trial court, stating:

> We find no basis for defendant's claim that the prosecutor was required to disclose evidence of past false or unfounded accusations made by the victim.  The trial court's order states otherwise.  Additionally, the trial court did not abuse its discretion to the extent that it denied defendant's request to have the prosecutor disclose unidentified evidence that would qualify for admission under MRE 404(b).  The prosecutor did not have a duty to find evidence for defendant that might satisfy MRE 404(b).  There is a distinction between the failure to develop evidence and the failure to disclose evidence.  "The prosecutor's office is not required to undertake discovery on behalf of a defendant."  In this case, defendant is arguing that because the prosecution failed to undertake his discovery, reversal is warranted.  We find the opposite to be true, and find no error in the trial court's opinion in this matter.

-13-

*Stadler*, 2004 WL2624741, at *3 (citations omitted).

The state courts' rulings are consistent with federal law. It is well settled that there is no general constitutional right to discovery in a criminal case. *Weatherford v. Bursey*, 429 U.S. 545, 559 (1977); *United States v. Presser*, 844 F.2d 1275, 1281 (6th Cir. 1988). "[A]ll the Constitution requires, per the due process clause, is that the defendant not be deprived of a fundamentally fair trial." *Lorraine v. Coyle*, 291 F.3d 416, 441 (6th Cir. 2002). A prosecutor's failure to disclose evidence favorable to the defense constitutes a denial of due process "where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady v. Maryland*, 373 U.S. 83, 87 (1963). But this rule is not violated – at least to the point of warranting habeas relief – unless the state actually suppresses evidence in its possession, and the suppressed evidence is material and favorable to the accused. *Elmore v. Foltz*, 768 F.2d 773, 777 (6th Cir. 1985). Favorable evidence is material "if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." *United States v. Bagley*, 473 U.S. 667, 682 (1985); *see also Kyles v. Whitley*, 514 U.S. 419, 432-36 (1995). Material evidence is that which is "so clearly supportive of a claim of innocence that it gives the prosecution notice of a duty to produce." *United States v. Clark*, 988 F.2d 1459, 1467 (6th Cir. 1993).

The obvious corollary to that rule is that "*Brady* . . . does not require the government to create exculpatory material that does not exist." *United States v. Sukumolachan*, 610 F.2d 685, 687 (9th Cir.1980); *see also Richards v. Solem*, 693 F.2d 760, 766 (8th Cir. 1982) ("Although the state has a duty to disclose evidence, it does not have a duty to create evidence."). In this case, the prosecution had no evidence of its witnesses' prior misconduct, and the petitioner has not come up

-14-

with any to date.  Due process does not require the police to seek and find exculpatory evidence.
The Michigan Court of Appeals correctly found that the State had no duty to investigate this case
more thoroughly than it did.  The petitioner is not entitled to habeas relief on this claim.

C.

The petitioner's fourth claim is that the identification by N.C. should have been suppressed
because the pretrial photographic show-up conducted by Detective McMillan was unduly
suggestive.  In order to prevail, the petitioner "would have to show that the state court's adjudication
of the claim was 'contrary to, or involved an unreasonable application of, clearly established Federal
law.'  28 U.S.C. § 2254(d)(1)."  *McDaniel v. Brown*, --- U.S.---, 2010 WL 58361 at *8 (Jan. 11,
2010).  In *Manson v. Brathwaite*, 432 U.S. 98, 114 (1977), the Supreme Court "held that when the
police have used a suggestive eyewitness identification procedure, 'reliability is the linchpin in
determining' whether an eyewitness identification may be admissible, with reliability determined
according to factors set out in *Neil v. Biggers*, 409 U.S. 188 (1972)."  *Ibid.*

The Michigan Court of Appeals found that there was "no basis in the record for concluding
that the trial court clearly erred in finding that the photographic lineup that the victim viewed in
March 2001 was not unduly suggestive."  *Stadler*, 2004 WL 2624741, at *3.  The court reasoned:

> The time lapse between the June 1997 sexual assault and the March 2001
> photographic lineup, while significant, was only one factor to consider in
> determining whether the photographic lineup was so impermissibly suggestive that
> it led to a substantial likelihood of misidentification.  There is no *per se* rule
> invalidating an identification procedure if a time lapse of more than eighteen months
> is involved.
>
> Furthermore, the trial court also found that there was an independent basis
> for the victim's in-court identification.  Because defendant has failed to address this
> aspect of the trial court's ruling, we deem this issue abandoned.

-15-

Whether the absence of counsel at the photographic lineup and the failure of the police to use a live lineup justified suppression of the victim's in-court identification present distinct questions that were outside the scope of defendant's motion to suppress. Hence, these questions are unpreserved and we review them for plain error affecting defendant's substantial rights. Because the evidence at the suppression hearing indicated that defendant was not in custody when the photographic lineup was held, Detective McMullen's use of a photographic lineup without the presence of counsel was not plain error.

*Id.* at *3-4 (citations omitted).

This Court cannot find fault with that reasoning. Due process protects the accused against the introduction of evidence which results from an unreliable identification obtained through unnecessarily suggestive procedures. *Moore v. Illinois*, 434 U.S. 220, 227 (1977). However, to determine whether an identification procedure violates due process, courts look first to whether the procedure was impermissibly suggestive; if so, courts then determine whether, under the totality of circumstances, the suggestiveness has led to a substantial likelihood of an irreparable misidentification. *Neil v. Biggers*, 409 U.S. 188 (1972). Five factors should be considered in determining the reliability of identification evidence: (1) the witness's opportunity to view the criminal at the time of the crime; (2) the witness's degree of attention at the time of the crime; (3) the accuracy of the witness's prior description of the defendant; (4) the witness's level of certainty when identifying the suspect at the confrontation; and (5) the length of time that has elapsed between the time and the confrontation. *Id.* at 199-200.

A criminal defendant has the initial burden of proving that the identification procedure was impermissibly suggestive. It is only after a defendant meets this burden of proof that the burden then shifts to the prosecutor to prove that the identification was reliable independent of the suggestive identification procedure. *See United States v. Wade*, 388 U.S. 218, 240 n.31 (1967); *Johnson v. Warren*, 344 F. Supp. 2d 1081, 1090 (E.D. Mich. 2004). If a defendant fails to show that

-16-

the identification procedures were impermissibly suggestive, or if the totality of the circumstances indicates that the identification is otherwise reliable, no due process violation has occurred. As long as there is not a substantial likelihood of misidentification, it is for the jury to determine the ultimate weight to be given to the identification. *See United States v. Hill*, 967 F.2d 226, 230 (6th Cir. 1992); *Johnson*, 344 F. Supp. 2d at 1090.

At an evidentiary hearing on October 18, 2002, Detective McMullen testified that when he met the victim in 2001, he took with him a photo array containing six mug shots that had been prepared earlier by Detective Maurer. McMullen said that the pictures were of white males, all with mustaches, and all about twenty years old. The pictures were arranged in two rows with three pictures in each row. McMullen met with the victim on March 9, 2001 and talked with her for about half an hour. He then showed her the six photographs, and she immediately said, "that's him, I will never forget that face," pointing at the photo of the petitioner bearing number five. Evid. Hr'g Tr. at 41, Oct. 18, 2002. There was no live lineup because the petitioner was not in custody at the time.

The petitioner has not argued any sound basis to question the trial court's finding that there was no evidence that the petitioner's photograph was suggested to the victim. Moreover, there is ample evidence in the record to support the conclusion that the victim's identification of the petitioner was based on something other than the photograph. She was with the petitioner at least twice before the rape occurred. Her familiarity with his features developed in non-traumatic circumstances unrelated to the assault. She knew him by name. She saw him for a considerable period of time in her home before he became aggressive. The likelihood of mistaken identity in this case is slim. The state courts' adjudication of this issue comports with Supreme Court precedent.

D.

-17-

In his fifth claim, the petitioner asserts that his trial was unfair because the trial court did not give an appropriate instruction to the jury regarding the failure of the prosecution to produce the individuals who were with N.C. at the bar the day she first met the petitioner.  The Michigan Court of Appeals rejected the petitioner's jury instruction claims primarily on state law grounds.  The court did note however that "[d]ue process requires that a prosecutor present sufficient evidence to justify a rational trier of fact in finding guilt beyond a reasonable doubt.  Hence, the instruction given by the trial court regarding the prosecutor's burden of proving each element of the crime beyond a reasonable doubt, which included, in part, a definition that 'reasonable doubt is a fair honest doubt growing out of the evidence or lack of evidence,' was sufficient to protect defendant's rights." *Stadler*, 2004 WL 2624741, at *4-5 (citations omitted).

The state court's disposition of this claim was not contrary to and did not unreasonably apply Supreme Court precedent.  A habeas petitioner is entitled to relief only if the defective jury instruction "so infected the entire trial that the resulting conviction violates due process." *Cupp v. Naughten*, 414 U.S. 141, 147 (1973).  A federal court may not grant the writ of habeas corpus on the ground that a jury instruction was incorrect under state law, *Estelle v. McGuire*, 502 U.S. 62, 71-72 (1991), and "[a]n omission, or an incomplete instruction, is less likely to be prejudicial than a misstatement of the law."  *Henderson v. Kibbe*, 431 U.S. 145, 155 (1977).  "[I]t must be established not merely that the instruction is undesirable, erroneous, or even 'universally condemned,' but that it violated some [constitutional] right." *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974).  The jury instruction "'may not be judged in artificial isolation,' but must be considered in the context of the instructions as a whole and the trial record." *Estelle*, 502 U.S. at 72 (quoting *Cupp*, 414 U.S. at 147).  The Court must "inquire 'whether there is a reasonable

-18-

likelihood that the jury has applied the challenged instruction in a way' that violates the Constitution." *Ibid.* (quoting *Boyde v. California*, 494 U.S. 370, 380 (1990)).

The petitioner's complaint about the trial court's failure to give a missing witness instruction finds no basis in federal precedent. There has been a recognition that "the jury may draw an adverse inference when a party fails to produce a material witness who is peculiarly available to that party." *United States v. Ariza-Ibarra*, 651 F.2d 2, 16 (2d Cir. 1981). However, an instruction of that sort is appropriate only on a showing that a party has "exclusive control over a witness who could provide relevant, noncumulative testimony [and] fails to produce the witness." *Ibid.* No such showing was made in this case, and – more importantly – no Supreme Court case has clearly established that a due process violation results from the failure to give such an instruction. Habeas relief cannot be predicated on this claim.

The petitioner also alleged that the trial court should have instructed the jury on the defense of consent *sua sponte*. However, the trial court's obligation to give instructions on the theories of the parties only exists where a request is made and there is evidence to support the theory. Here, the evidence established that N.C. was overcome by force and violence, and nothing in the record suggests that the sexual act was consensual. The petitioner's theory was that he was not the perpetrator. There were no witnesses to support the petitioner's theory of consent.

This Court is not persuaded that the jury instructions, as given, denied the petitioner a fair trial, or so infected the entire trial that the resulting conviction violated his due process rights. Therefore, this Court concludes that the state court's resolution of the jury instruction claims is not contrary to or an unreasonable application of Supreme Court precedent.

E.

-19-

In his seventh habeas claim, the petitioner alleges that trial counsel was ineffective because he failed to investigate adequately the petitioner's alibi defense and call alibi witnesses, and he did not allow the petitioner to testify in his own defense.  As noted earlier, the trial court held an evidentiary hearing on these issues pursuant to *People v. Ginther*, 390 Mich. 436, 212 N.W.2d 922 (1973), and rejected the petitioner's arguments, finding that trial counsel investigated the alibi defense and chose not to raise it as a matter of trial strategy after discussing the options with the petitioner.  The trail judge found that "Barkovic and defendant made a strategic decision not to call alibi witnesses at trial.  In light of the potential problems of the alibi testimony, Barkovic's adivce was within the range of competence demanded of attorneys in criminal cases." Tr. Ct. Op. at 4.  The state court of appeals upheld "the trial court's determination that defense counsel's decisions not to pursue an alibi defense or have defendant testify were not objectively unreasonable," finding that "defendant consented to these strategic decisions."  *Stadler*, 2004 WL 2624741, at *8.  The court of appeals also noted that "the evidence [at the post-remand hearing] indicated that defense counsel conducted a reasonable investigation of defendant's proposed alibi defense by discussing the matter with defendant's mother and defendant.  Defense counsel's concern that the alibi testimony would be viewed with suspicion, given that only persons having a familial relationship with defendant would provide the testimony, was reasonable."  *Ibid.*  To determine if those rulings reasonably applied federal law, a brief review of the evidentiary hearing testimony is useful.

At that hearing, trial counsel Timothy Barkovic testified that he was the defendant's third attorney, and he met with the petitioner at least ten times in the county jail to discuss the trial.  Throughout these meetings, the petitioner continuously maintained his innocence.  Barkovic acknowledged discussing the prospect of calling the petitioner's mother as an alibi witness.  She

-20-

would have testified that the petitioner was at a party at her house on the night in question.  Barkovic also discussed this defense with the petitioner's mother, Bonnie Stadler.  According to Barkovic, however, "there was some controversy over – not a controversy, but there was some dispute as to the date of this offense and the date on which a party was held at the Stadler residence."  Hr'g Tr. at 10, Jan. 21, 2004 (testimony of Timothy Barkovic).  Counsel also stated that he has never received the name of other family members who were willing to testify in support of the petitioner's alibi defense, nor did he ask for them, although he acknowledged that he was told that such family members existed and "were just generally identified as being family members."  *Id*. at 11.  Barkovic conceded that he made the decision not to present an alibi defense before he interviewed potential alibi witnesses other than Bonnie Stadler – i.e., Michael Nusbietel, the petitioner's nephew, and Marie Stadler, the petitioner's sister.   He justified his conduct by listing the following considerations:

> Number one, neither Mr. Stadler nor his mother could definitively give me any information that would lead me to believe that the so-called party at the family residence coincided with the date of this offense.  And no one was able to in fact verify that the dates coincided so that in fact an alibi would have occurred to taken place.
> Secondly, the alibi witnesses were all family members of Mr. Stadler, and he and I discussed the fact that by virtue of the relationship with the alibi witnesses being family members their testimony may be suspect based upon the relationship by and between them and Mr. Stadler.
> And lastly, I discussed in general terms the defense itself.  The fact that I had had significant prior trial experience with the use of alibi witnesses and after those trials in terms of interviewing witnesses and the like and interviewing prospective jurors the fact that alibi defenses by family members just doesn't seem to work so to speak.
> The testimony is considered suspect to begin with but when you have family members supporting an alibi it becomes even more or less credible. . . .

*Id*. at 14-15.  A photograph was presented at the hearing depicting the petitioner at his mother's house, bearing the inscription of the date it was taken, "6-14-97," made by Bonnie Stadler.  Barkovic

-21-

stated that he was not sure if that photograph was ever shown to him because he reviewed many photographs provided to him by the petitioner's mother.

Barkovic also addressed his decision not to call the petitioner as a witness, explaining that he believed the petitioner could not be trusted on the witness stand. The petitioner had prior stalking convictions, which could have been used to impeach him, and Barkovic believed the petitioner was a "loose cannon" who could open the door for introduction of character evidence in the case.

Barkovic maintained that he had tried at least two hundred criminal cases in his last eighteen years as an attorney. He said he discussed the possibility of an alibi defense at length with the petitioner, and since the victim was the only complaining witness testifying against him, Barkovic believed that an alibi defense was not necessary. Barkovic identified a letter dated August 27, 2002, in which he requested that the petitioner provide to him the names and addresses of any alibi witnesses that he wished to call so that Barkovic could give proper notice to the prosecution. It appears that at some point the petitioner acceded to Mr. Barkovic's advice not to rely on the alibi defense, and Barkovic confirmed his client's assent to not call alibi witnesses in the September 16, 2002 letter to him, writing, "You agreed with me that [alibi witnesses] should not be called. Accordingly, no alibi witnesses will be called." *Id.* at 46. Neither of these letters are part of the record before the Court, but it appears that both were introduced during the post-remand hearing.

Bonnie Stadler, the petitioner's mother, testified that she told Barkovic that her son was present at a family gathering at her house on June 14, 1997 during the entire evening. She said the party started at 5:30 p.m., but she could not recall if the petitioner was there at that time. She did insist that the petitioner, his sister, and she were at the party all night, and when the last few people left the party left around 11:15 p.m., the petitioner was asleep on the couch and he never left the

-22-

house.  She was then shown a picture of the petitioner and Ed Stadler, saying that the picture was

taken on the day of the party because she wrote the date on the back of the picture, as was her

custom.  Bonnie Stadler testified that she hired Mr. Barkovic on the recommendation of another

inmate.  She said that she told Barkovic about the petitioner's alibi during their first meeting.  At

their second meeting, she said Barkovic told her that they should not pursue an alibi defense.  He

told her that in his experience juries do not usually believe an alibi defense.  She said she did not

disagree with him because she felt intimidated.  But she did write the witnesses' names down for

several attorneys including Barkovic, for whom she wrote down the names of alibi witnesses on the

back of the letter Barkovic had sent to her requesting these names, and gave the letter back to him.


The petitioner's mother also related the contents of another letter Barkovic sent to the

petitioner on September 16, 2002.  In that letter, Barkovic insisted that the petitioner get a haircut

before trial, and if he did not, then Barkovic would withdraw from the case.  According to Bonnie

Stadler, trial counsel also told her that if things did not go as he suggested, she should get another

attorney.

Mrs. Stadler acknowledged that she did testify in a prior criminal sexual misconduct case

on her son's behalf when he was charged with the criminal sexual conduct resulting in personal

injury in 1991, and he was acquitted following the trial.  However, her testimony in that case was

confined to stating that she had seen the complainant at her house to counter the victim's allegation

that she had never visited Stadler's house.

Marie Stadler, the petitioner's sister, testified that she was at her parents' home on June 14,

1997 together with her son Michael Nustietel and the petitioner.  She said that the petitioner was

-23-

present from 6:00 p.m. when she arrived until 11:30 p.m. when she left.  To verify the date of the gathering, she produced a newspaper article covering a fishing derby that her son competed in on June 14, 1997.  She said her son won third place, and that one of her parents took him to the derby, which ended around 4:00 p.m.  Her son was not in the photograph.

The petitioner also testified that he was at a party at his parents' house on the night in question; he said he was there all evening.  He said he told his attorney that he wanted the alibi witnesses to be called, but attorney Barkovic told him that a jury would not believe relatives as the alibi witnesses.  The petitioner also testified that he told trial counsel that he wanted to testify without testifying about his character, but Barkovic told him he should not because the prosecution could then bring up his prior bad acts on other charges that he had against him.  He acknowledged that he had been previously convicted of a couple of stalking charges as part of a plea bargain on a marijuana charge.  The petitioner said he did not remember the September 16, 2002 letter confirming the agreement on which defense would be pursued, although he may have seen it.  He said he wanted to testify that he had never seen the complainant before, but Barkovic told him that if he did not follow his advice, then he would withdraw from the case.  The petitioner said he was uncomfortable about trial counsel withdrawing because he needed an attorney and had no money to retain new counsel.

Based on this record, the petitioner contends that attorney Barkovic's performance was constitutionally deficient.  However, to establish the ineffective assistance of counsel, the petitioner must show that: (1) counsel's errors were so serious that "counsel was not functioning as the 'counsel' guaranteed the defendant by the Sixth Amendment;" and (2) counsel's deficient performance prejudiced the defense.  *Strickland v. Washington*, 466 U.S. 668, 687 (1984).  An

-24-

attorney's performance is deficient if "counsel's representation fell below an objective standard of reasonableness." *Id.* at 688. But "[j]udicial scrutiny of counsel's performance must be highly deferential." *Id.* at 689. The Supreme Court has "declined to articulate specific guidelines for appropriate attorney conduct and instead [has] emphasized that '[t]he proper measure of attorney performance means simply reasonableness under prevailing professional norms.'" *Wiggins*, 539 U.S. at 521 (quoting *Strickland*, 466 U.S. at 688).

Without question, the decision made by attorney Barkovic to jettison the alibi defense was a strategic choice on his part. As a general rule, trial counsel's strategic decisions on how the trial is to be conducted are afforded great deference. As the Supreme Court explained:

> It is all too tempting for a defendant to second-guess counsel's assistance after conviction or adverse sentence, and it is all too easy for a court, examining counsel's defense after it has proved unsuccessful, to conclude that a particular act or omission of counsel was unreasonable. A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time. Because of the difficulties inherent in making the evaluation, a court must indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy.

*Strickland*, 466 U.S. at 689 (internal quotes and citations omitted). "[A] lawyer's acts and omissions must be judged on the basis of what he knew, or should have known, at the time his tactical choices were made and implemented." *Ouber v. Guarino*, 293 F.3d 19, 25 (1st Cir. 2002) (citing *Bell v. Cone*, 535 U.S. 685 (2002)). It is equally true that "errors of tactics or omission do not necessarily mean that counsel has functioned in a constitutionally deficient manner." *Greer v. Mitchell*, 264 F.3d 663, 676 (6th Cir. 2001).

Of course, the determination that trial counsel's ill-conceived choices amount to trial strategy does not insulate them from habeas review. "Strategic" choices that have no hope of succeeding, are made without adequate investigation or preparation, or actually imperil the defendant's case cannot be considered "sound." For instance, in *Wiggins*, 539 U.S. at 527-28, a death penalty case, the Supreme Court held that the state court of appeals unreasonably applied *Strickland*'s governing principles in rejecting the petitioner's ineffective assistance claim because the state court of appeals's conclusion that counsel's performance was within professional norms was objectively unreasonable. Counsel did not present evidence at the penalty phase on the petitioner's personal background – a valid strategic choice under some circumstances – but counsel had failed to make a reasonable investigation into the petitioner's social history. *Ibid.* (noting that under *Strickland*, "strategic choices made after less than complete investigation are reasonable precisely to the extent that reasonable professional judgments support the limitations on investigation" (citation and internal quotation marks omitted)). This failure reasonably to investigate, in turn, rendered the state court's deference to counsel's strategic decision not to present mitigating evidence of the petitioner's social history objectively unreasonable as well. *Ibid.* (stating that "counsel chose to abandon their investigation at an unreasonable juncture, making a fully informed decision with respect to sentencing strategy impossible"). A "decision . . . cannot be according the normal deference to strategic choices [where] it was uninformed." *Rolan v. Vaughn*, 445 F.3d 671, 682 (3d Cir. 2006).

Other "strategic" choices by counsel, such as the failure to object to obviously tainted and inadmissible evidence, *Ege v. Yukins*, 485 F.3d 364, 378-79 (6th Cir. 2007), and the failure to cross-examine a key prosecution witness, *Higgins v. Renico*, 362 F. Supp. 2d 904, 916-17 (E.D.

-26-

Mich. 2005), have been found to be so unsound as to negate the finding that counsel's performance tracked "prevailing professional norms." *Wiggins*, 539 U.S. at 521.

Moreover,"[o]nly choices made after a reasonable investigation of the factual scenario are entitled to a presumption of validity." *Rolan*, 445 F.3d at 682 (citation omitted). An obviously defective choice is "not a reasonable strategic decision entitled to deference." *Moss v. Hofbauer*, 286 F.3d 851, 865 (6th Cir. 2002) (finding that defense counsel's reliance on the cross-examination of an eyewitness by a co-defendant unreasonable when the two defendants' interests were not aligned). As the Seventh Circuit has put it:

> [I]f as in this case there is only one argument that could be made on the defendant's behalf, and it is not frivolous, the lawyer may have a professional obligation to make it. *Keys v. Duckworth*, 761 F.2d 390, 392 (7th Cir. 1985) (per curiam); *cf. Fortenberry v. Haley*, 297 F.3d 1213, 1226-27 (11th Cir. 2002) (per curiam); *Tejeda v. Dubois*, 142 F.3d 18, 25 (1st Cir. 1998). It is not suggested that Rezin's lawyer had a tactical reason not to make the argument that we are about to examine; he could not have, since he had no other basis for knocking five years off his client's sentence. "The spectrum of counsel's legitimate tactical choices does not include abandoning a client's only defense." *United States ex rel. Barnard v. Lane*, 819 F.2d 798, 805 (7th Cir. 1987). There was nothing to lose and something to gain, though only in a probabilistic sense, from making the argument.

*United States v. Rezin*, 322 F.3d 443, 446 (7th Cir. 2003).

It is not difficult to conclude in this case that attorney Barkovic's defense of the petitioner was poorly conceived and badly executed. The main thrust of his strategy appeared to be the exploitation of the victim's inconsistent description of the assailant's pre-rape conduct, her failure to give the police the petitioner's first and last names, and the victim's initial reluctance to prosecute would create a reasonable doubt in the jury's mind. It is unclear whether that doubt would have rested on a belief that no rape occurred, or the victim was mistaken about the identity of her assailant, or the sexual activity was consensual; and Barkovic's trial tactics and argument shed little

-27-

light on the intended logical consequence of his theme.  He argued that N.C.'s story was implausible, suggesting that she fabricated the assault; but that strategy was problematic because it required that he explain away the physical evidence (the black eye and bite mark) introduced by the State.  The alibi defense would have been quite consistent with any defense theory except consent. Barkovic's only justification for rejecting it was his concern over fixing the date of the party, which was undermined by the undisputed conversation he had with the petitioner's mother, who had a photograph documenting the date (he never talked to the sister, who had additional evidence of the date of the party); and his personal belief that juries usually turn a cold shoulder to family-member witnesses who can establish an alibi.  This Court disagrees with the state courts' conclusions that Barkovic's choice was reasonable and made after a proper investigation.

However, despite that disagreement, the Court cannot conclude that habeas relief is warranted on the ground of ineffective assistance of counsel.  As the Supreme Court explained last term:

> The question "is not whether a federal court believes the state court's determination" under the *Strickland* standard "was incorrect but whether that determination was unreasonable – a substantially higher threshold." . . . And, because the *Strickland* standard is a general standard, a state court has even more latitude to reasonably determine that a defendant has not satisfied that standard.  *See Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004) ("[E]valuating whether a rule application was unreasonable requires considering the rule's specificity.  The more general the rule, the more leeway courts have in reaching outcomes in case-by-case determinations").

*Knowles v. Mirzayance*, 129 S. Ct. at 1420 (citation omitted); *see also Wood v. Allen*, -- U.S. --, --, 2010 WL 173369, *6 (Jan. 20, 2010) ("It suffices to say, however, that a state-court factual determination is not unreasonable merely because the federal habeas court would have reached a different conclusion in the first instance.").

The state courts' determination that Barkovic's strategic choice was reasonable was based on their observations that he articulated reasons for recommending against the alibi defense, and the petitioner's consent to that choice. There is evidence in the record that supports those conclusions, including Barkovic's own testimony and the letter confirming the trial strategy he sent to the petitioner. The state courts' conclusion that the petitioner consented to the strategy – albeit without much alternative, since trial was looming and he was out of money to hire a new lawyer – is not clearly erroneous and therefore presumed correct. 28 U.S.C. § 2254(e)(1); *West v. Seabold*, 73 F.3d at 84. The state courts' conclusion that attorney Barkovic's failure to call alibi witnesses and present alibi defense did not amount to substandard performance – even if he had nothing to lose by presenting the defense, *Knowles*, 129 S. Ct. at 1419 (stating that the Supreme "Court has never established anything akin to the Court of Appeals' 'nothing to lose' standard for evaluating *Strickland* claims) – was not an unreasonable application of Supreme Court precedent.

The decision not to allow the petitioner to testify is a far easier call. Attorney Barkovic testified that he had several consultations with the petitioner on this issue, and Barkovic learned that the petitioner wanted to take the stand and tell the jury that he was not the type of person who would commit such an offense. Since the petitioner had been convicted of stalking, Barkovic reasonably feared that such testimony would have opened the door to adverse character evidence. Barkovic explained that despite his repeated attempts to discourage the petitioner from making such statements if allowed to testify, he believed the petitioner to be a "loose cannon," and he could not trust him. Hr'g Tr. at 23, Jan. 16, 2004. It appears that the petitioner ultimately acquiesced in the decision to remain silent.

-29-

All criminal defendants, including the petitioner, have a constitutional right to testify in their own behalf. *Rock v. Arkansas*, 483 U.S. 44, 49 (1987). This right is personal to the defendant and may be relinquished only by the defendant. *United States v. Joelson*, 7 F.3d 174, 177 (9th Cir. 1993). Relinquishment of the right must be knowing and intentional. *Ibid.* Defense counsel's role is to advise the defendant whether to testify, but the ultimate decision is for the defendant to make. *United States v. Hover*, 293 F.3d 930, 933 (6th Cir. 2002). However, "when a tactical decision is made not to have the defendant testify, the defendant's assent is presumed." *United States v. Webber*, 208 F.3d 545, 551 (6th Cir. 2000).

> This is so because the defendant's attorney is presumed to follow the professional rules of conduct and is 'strongly presumed to have rendered adequate assistance' in carrying out the general duty 'to advocate the defendant's cause and the more particular duties to consult with the defendant on important decisions and to keep the defendant informed of important developments in the course of the prosecution.' *Strickland v. Washington*, 466 U.S. 668, 688-90 (1984).

*Ibid.* (footnote omitted).

The state trial court concluded that trial counsel's advice against the petitioner testifying on his own behalf was within the range of competence demanded of attorneys in criminal cases, and the court of appeals agreed. Those decisions are reasonable, supported by the record, and constitute a reasonable application of *Strickland*. The petitioner is not entitled to habeas relief on this part of his ineffective assistance of counsel claim.

F.

In his ninth claim, the petitioner contends that his sentence is cruel and unusual because it is disproportionately severe. The state court of appeals rejected that claim on the merits.

A habeas petitioner who seeks to challenge the severity of a prison sentence on Eighth Amendment grounds faces a formidable challenge, since, as noted above, he may obtain relief only

by demonstrating that a state court decision contravened or misapplied "clearly established" Supreme Court precedent.  The Supreme Court has acknowledged "that our precedents in this area have not been a model of clarity."  *Lockyer v. Andrade*, 538 U.S. 63, 72 (2003).  "Indeed, in determining whether a particular sentence for a term of years can violate the Eighth Amendment, we have not established a clear or consistent path for courts to follow."  *Ibid.*  The Supreme Court declared, therefore, that the general applicability of the proportionality standard to term-of-years sentences was clearly established, but confessed a lack of clarity as to the factors lower courts should consider in making that determination.  *Ibid.*  The Court concluded that "the only relevant clearly established law amenable to the 'contrary to' or 'unreasonable application of' framework is the gross disproportionality principle, the precise contours of which are unclear, applicable only in the 'exceedingly rare' and 'extreme' case."  *Id.* at 73.

In *Lockyer*, the Supreme Court reversed the Ninth Circuit's grant of habeas corpus on the ground that two twenty-five-years-to-life sentences imposed under California's "three strikes" law, where the triggering felony was the theft of $150 worth of video tapes, violated the Cruel and Unusual Punishment Clause of the Eighth Amendment.  The Court noted that the "thicket" created by its jurisprudence consisted primarily of its decisions in *Solem v. Helm*, 463 U.S. 277 (1983), *Harmelin v. Michigan*, 501 U.S. 957 (1991), and *Rummel v. Estelle*, 445 U.S. 263 (1980).  The California state court observed that the proportionality rule set forth in *Solem* was cast into doubt by *Harmelin* and proceeded to analyze Andrade's sentence under the approach taken in *Rummel*, where the Supreme Court rejected a claim that a life sentence imposed under Texas's recidivist statute was grossly disproportionate to the theft felonies that formed the predicate for the sentence. The California court concluded that Andrade's sentence was not disproportionate.  The Supreme

-31-

Court held that this decision was not contrary to or an objectively unreasonable application of federal law that was clearly established by the Supreme Court. *Lockyer*, 538 U.S. at 72-77.

A plurality of the Supreme Court has held that the Eighth Amendment does not require strict proportionality between the crime and sentence. *See Harmelin*, 501 U.S. at 965. As the Supreme Court observed in *Lockyer*, it is generally recognized after *Harmelin* that the Cruel and Unusual Punishment Clause of the Eighth Amendment forbids only an extreme disparity between crime and sentence, that is, sentences that are "grossly disproportionate" to the crime. *Id.* at 1001 (Kennedy, J., concurring); *Coleman v. Mitchell*, 268 F.3d 417, 453 (6th Cir. 2001) (citing *Coker v. Georgia*, 433 U.S. 584, 592 (1977)); *United States v. Hopper*, 941 F.2d 419, 422 (6th Cir. 1991).

"Outside the context of capital punishment, successful challenges to the proportionality of particular sentences have been exceedingly rare." *Rummel*, 445 U.S. at 272. Rummel was convicted of obtaining $120.75 by false pretenses, a crime punishable by at least two years but not more than ten years in prison. He was sentenced as a recidivist to life imprisonment with the possibility of parole. His two prior felonies consisted of fraudulent use of a credit card to obtain $80 worth of goods and services, a felony punishable by two to ten years in prison, and passing a forged check for $28.36, a crime punishable by two to five years in prison. The Supreme Court held that Rummel's life sentence under the state recidivist statute did not constitute cruel and unusual punishment. Similarly, in *Harmelin*, the Supreme Court upheld a life sentence without the possibility of parole for possession of more than 650 grams of cocaine for an offender with no prior felony convictions. The Supreme Court overturned a life sentence in *Solem* on the ground that it was significantly disproportionate to Helm's crime and therefore prohibited by the Eighth Amendment. However, Helm had been sentenced to life imprisonment without the possibility of parole for

-32-

uttering a "no account" check for $100, and his prior felonies also were minor, nonviolent crimes. By contrast, in 2003, the Supreme Court reaffirmed *Rummel* and found constitutional a sentence of twenty-five years to life imposed upon a fifth felony conviction. *See Ewing v. California*, 538 U.S. 11, 24-31 (2003). The Michigan courts' determination that a sentence of twenty-five to forty years for first' degree criminal sexual conduct was not disproportionate is not an unreasonable application of this Supreme Court precedent.

Michigan law allowed a prison term of life imprisonment or any number of years. Mich. Comp. Laws § 750.520b(2). The challenged sentence fell within the statutory limits. The state courts noted that the petitioner engaged in predatory behavior and had subsequent convictions for other criminal behavior. The trial court also found that the petitioner was not remorseful and posed a continuous threat. These circumstances were not unusual and did not overcome the presumption of proportionality. "[A] sentence within the statutory maximum . . . generally does not constitute 'cruel and unusual punishment.'" *United States v. Organek*, 65 F.3d 60, 62 (6th Cir.1995) (citation omitted). "As long as the sentence remains within the statutory limits, trial courts have historically been given wide discretion in determining 'the type and extent of punishment for convicted defendants.'" *Austin*, 213 F.3d at 301 (quoting *Williams v. New York*, 337 U.S. 241, 245 (1949)).

The state courts' conclusion that the trial court did not abuse its discretion at sentencing was not contrary to or an unreasonable application of Supreme Court precedent.


G.


-33-

In his tenth claim, the petitioner asserts that the trial court judge violated his Sixth Amendment right to a trial by jury by using factors to score his sentencing guidelines that had not been submitted to a jury and proven beyond a reasonable doubt or admitted to by the petitioner. The petitioner believes that *Blakely v. Washington,* 542 U.S. 296 (2004), and *Apprendi v. New Jersey*, 530 U.S. 466, 490 (2000), support his position. However, the claim that Michigan's sentencing guideline system, wherein judge-found facts are used to establish the minimum sentence of an indeterminate sentence, violates the Sixth Amendment has been foreclosed by the Sixth Circuit's decision in *Chontos v. Bergius*, No. 08-1031, __ F.3d __ (6th Cir. Nov. 10, 2009). This Court is bound by that decision.

### H.

The Court finds that the petitioner's third, sixth, and eighth claims are barred by procedural default. In his third claim, the petitioner contends that he was deprived of a fair trial by N.C.'s destruction of exculpatory evidence when she showered and cleaned the couch, and by the police officers' failure to take steps to preserve that evidence. His sixth claim is that the prosecutor committed misconduct when he referred to N.C. as the victim and called the petitioner a "predatory animal" and "a monster." In his eighth claim, the petitioner contends that he was denied the right to substitute counsel at sentencing. None of these alleged errors were objected to at trial, and the state court of appeals reviewed them for plain error.

Under the procedural default doctrine, a federal habeas court will not review a question of federal law if the state court's decision rests on a substantive or procedural state law ground that is independent of the federal question and is adequate to support the judgment. *See Coleman v. Thompson*, 501 U.S. 722, 729 (1991). However, "a procedural default does not bar consideration

-34-

of a federal claim on either direct or habeas review unless the last state court rendering a judgment in the case 'clearly and expressly' states that its judgment rests on the procedural bar." *Harris*, 489 U.S. at 263. Furthermore, "only a 'firmly established and regularly followed state practice' may be interposed by a State to prevent subsequent review . . . of a federal constitutional claim." *Ford v. Georgia*, 498 U.S. 411, 423-24 (1991) (quoting *James v. Kentucky*, 466 U.S. 341, 348-51 (1984)); *see also Calderon v. United States Dist. Ct. for the E. Dist. of Cal.*, 96 F.3d 1126, 1129 (9th Cir. 1996) (internal quotation omitted) ("For the procedural default doctrine to apply, a state rule must be clear, consistently applied, and well-established at the time of the petitioner's purported default.").

The last state court to issue a reasoned opinion on this claim, the Michigan Court of Appeals, held that these claims were not preserved because counsel failed to lodge a timely objection. *Stadler*, 2004 WL 2624741 at *3, 5-6, 8-9. In Michigan, the contemporaneous-objection rule was firmly established and regularly followed with respect to claims regarding the admission of evidence at the time of the petitioner's trial. *See People v. Grant*, 445 Mich. 535, 545, 520 N.W.2d 123, 127-28 (1994); *People v. Aldrich*, 246 Mich. App. 101, 113, 631 N.W.2d 67, 74-75 (2001); Mich. R. Evid. 103(a)(1). The petitioner asserts that his trial counsel was ineffective as cause to excuse his procedural default. This argument must fail. As noted above, the Court concludes that trial counsel was not constitutionally ineffective. Because the petitioner failed to demonstrate cause to excuse his procedural default, this Court may not review the claims unless he can establish a constitutional error resulting in a fundamental miscarriage of justice. *Schlup v. Delo*, 513 U.S. 298, 314-15 (1995).

The Supreme Court has held that application of the "miscarriage of justice" exception to the procedural default rule should apply only to cases where there is a likelihood of convicting a person

-35-

who is actually innocent. *Schlup*, 513 U.S. at 321. "'[A]ctual innocence' means factual innocence, not mere legal insufficiency." *Bousley v. United States*, 523 U.S. 614, 623 (1998). "To be credible, [a claim of actual innocence] requires [the] petitioner to support his allegations of constitutional error with new reliable evidence-whether it be exculpatory scientific evidence, trustworthy eyewitness accounts, or critical physical evidence-that was not presented at trial." *Schlup*, 513 U.S. at 324. The petitioner has not done so here. In fact, the petitioner has pointed to no new evidence that the jury was not given. Therefore, his procedural default will not be excused on this ground.

Moreover, even if these claims were not procedurally barred, they would fail on the merits. "Habeas review does not encompass state court rulings on the admission of evidence unless there is a constitutional violation." *Clemmons v. Sowders*, 34 F.3d 352, 357 (6th Cir. 1994) (citing *Fuson v. Jago*, 773 F.2d 55, 59 (6th Cir. 1985)). An evidentiary ruling violates a criminal defendant's due process rights only "when it is so egregious that it results in a denial of fundamental fairness." *Bugh v. Mitchell*, 329 F.3d 496, 512 (6th Cir. 2003). In this case, the petitioner failed to demonstrate that a miscarriage of justice occurred on the basis of his actual innocence. Thus, these claims are procedurally defaulted and review of them is barred.

## III.

The state court decisions in this case were not contrary to federal law, an unreasonable application of federal law, or an unreasonable determination of the facts. The petitioner has not established that he is presently in custody in violation of the Constitution or laws of the United States.

-36-

Accordingly, it is **ORDERED** that the petitioner's petition for a writ of habeas corpus is

**DENIED**.

s/David M. Lawson
DAVID M. LAWSON
United States District Judge

Dated:   January 22, 2010

**PROOF OF SERVICE**

The undersigned certifies that a copy of the foregoing order was served
upon each attorney or party of record herein by electronic means or first
class U.S. mail on January 22, 2010.

s/Teresa Scott-Feijoo
TERESA SCOTT-FEIJOO